JOHN T. WOODRUFF, Appellant, v. C. H. COLE, J. G. STARR, WILLIAM HOUK, LOY T. LeBOW and UNITED IRON WORKS COMPANY.

In Banc, February 17, 1925.

1. **EQUITY: Appellate Practice: Deference to Trial Court.** In a suit in equity, although triable *de novo* in the appellate court, deference will usually be yielded to the findings of the trial chancellor upon disputed questions of fact where the evidence is oral.

2. **CORPORATION: Stockholder and Manager: Purchase of Stock for Less Than Value.** The purchase for himself of stock by a stockholder of a corporation, who is also manager of its operating plants and a director, for much less than its actual value, from another stockholder, who knows its actual value, is not fraudulent, and is not such a contract as can be rescinded by the seller, although the purchaser, because the debt he has incurred in borrowing the money with which to buy is greater than he feels able to carry, sells the greater part of it, at the price at which he bought it, to other stockholders and directors, including the president, who

Woodruff v. Cole.

dominate the company, and buy at his solicitation. In such case said purchaser is not a "straw man" for the other stockholders and officers.

3. ———: ———: ———: **Knowledge: Trust Relation: Presumptive Fraud.** Even if it be conceded (though not conceded in this case) that a director or managing officer of a corporation stands in such close fiduciary relation to individual stockholders that he must make full disclosure of all facts he knows before his purchase of stock from them can be considered valid, such rule does not apply where the stockholder had in former years been a director of the company, knew all about its properties by physical inspection, and knew the book value of the stock was two dollars at the time he sold it to the manager for fifty cents, and there was nothing else of value to him to be disclosed by the manager; for if a purchasing stockholder knows the facts, the rule, if conceded, would not avail him.

4. ———: ———: ———: **Actual Fraud: Depression of Market Value by Refusal to Declare Dividends.** The owners of ninety per cent of the stock of a corporation favored the policy of its president of enlarging its business, using its earnings in betterments, buying other plants and building up a big concern, and that policy was regularly ratified during eight years prior to 1914 at the meetings of stockholders, which plaintiff attended and in which he participated, and in which expansions, although contending that dividends be declared, he participated, and says there was no fraud in the expenditures therefor, and this policy continued until after he sold his stock to the manager of the company's operating plants in 1915 for one-half its face value, at a time it had a book value of twice its par value, and a part of the stock he sold, within a month, passed to the dominating president, at the same price. A year or two later, owing to the great profit reaped by such corporations during the continuance of the World War, the corporation transferred its properties to a new company, and the stockholders received $315 in cash and stock for each $100 share. *Held*, that there was no such depression in the market value of the stock by a refusal to declare dividends as amounted to actual fraud upon plaintiff.

Citations to Headnotes: 1, Appeal and Error, 4 C. J. par. 2651; 2, to 4, Corporations, 14a C. J. pars. 1896, 1943.

Appeal from Green Circuit Court.—*Hon. Orin Patterson*, Judge.

AFFIRMED.

*W. D. Tatlow* for appellant.

(1)   It is elementary law in this State that the directors in dealing with the corporation or with corporate property act in a fiduciary capacity.   Proctor v. Farra, 213 S. W. 475.; Brent v. Priest, 86 Mo. 482; Ward v. Davidson, 89 Mo. 458; Keokuk Packet Co. v. Davidson, 95 Mo. 473; Manufacturers Bank v. Iron Co., 97 Mo. 38; Thompson v. Greely, 107 Mo. 589; Hannerty v. Standard Theatre Co., 109 Mo. 297; Cummings v. Parker, 250 Mo. 427; Lyons v. Carter, 253 Mo. 539;. Geddes v. Anaconda Cooper Mining Co., 41 Sup. Ct. Rep. 212.   (2)   In several of the cases, supra, this court has broadly announced the rule that the directors are trustees and agents of the corporation and stockholders. This court so far has not been called upon to pass directly upon the question as to whether such fiduciary relation exists between the director and the individual stockholder where the dealings between them relate to his stock and are materially affected by the power and authority of the director over the property of the corporation.   There is some conflict of authority with reference to this point. The clear weight of authority sustains such fiduciary relation. It is clearly so on principle, as it is the inevitable, logical conclusion, necessarily deducible from the premise, that the director is a trustee for the corporation when dealing directly with it or with the property of the corporation or with the stockholders as a body.   Oliver v. Oliver, 118 Ga. 362; Stewart v. Harris, 69 Kan. 498; Strong v. Repide, 213 U. S. 417; Dorson v. National Life Ins. Co., 157 N. W. 929; Jacquith v. Mason, 156 N. W. 1043; McMannis v. Durant, 154 N. Y. Supp. 581; Barber v. Martin, 67 Neb. 445;  Steinfield v. Nelson, 2 Ariz. 381; Walsham v. Stainton, 66 Eng. Chancery, 527; 2 Thompson on Corporations, secs. 1259, 1218, p. 169; Black on Rescission, sec. 51; McCourt v. Singgers Bigger, 145 Fed. 103.   This court, as well as many others, has had occasion to point out in clear and unmistakable terms in a variety

of cases that "the certificate of the stock is not the stock, but the mere evidence of the ownership of the stock." Richardson v. Bush, 198 Mo. 174; Cook on Corporations, sec. 485; Thompson on Corporations, sec. 2348; Armour Bros. v. Bank, 113 Mo. 12; Cafferty v. Cole Co., 95 Mo. App. 174; Jellenike v. Huron, 177 U. S. 1. (3) The majority of the stockholders in exercising any corporate powers are on the same principle trustee for the minority. Jones v. Missouri Edison Elec. Co., 144 Fed. 765; Wheeler v. Abiline, 159 Fed. 391; Backus v. Brooks, 195 Fed. 452; Union Pac. Railroad v. Frank, 226 Fed. 920; Iroquois Iron Co. v. Kruse, 241 Fed. 441; Davis v. Virginia Railroad & Power Co., 229 Fed. 633. (4) The trial court expressly recognized the rule in its finding of facts, as did counsel for defendants, that if the defendants as directors of the corporation adopted a policy of refusing to pay dividends out of the earning of the corporation for the purpose of enabling them to purchase the stock of the corporation at and for a nominal consideration, they were liable directly as trustees to the victim shareholders. This is well-settled law. Von Au v. Magenheimer, 110 N. Y. Supp. 629, 89 N. E. 1114; Ritchie v. McMullen, 79 Fed. 522; Walsham v. Stainton, 1 De Gex, J. & S. 678. This doctrine, which is elementary, presupposes that the directors have the power to depress the stock by withholding dividends, and if they do so intentionally then they are liable for their wrongful acts. The New York case, supra, was an action at law. On the clearest principle of equity where the value of the stock is depressed by the nondividend paying policy, even though the directors were acting in good faith in not paying dividends, yet if on the eve of discontinuing that policy they take advantage of the situation that they have brought about it is identical in principle with a malicious intent in the first instance. Equity in such cases looks more to the result accomplished than to the evil intent. Glasscock v. Minor, 11 Mo. 655; Florida v. Morrow, 44 Mo. App. 538; Loveless v. Seeter, 93 Mo. App. 440; Lynch v. Land & Timber Co., 135 Mo. App.

672; Peters v. Lohman, 171 Mo. App. 465; Faulkner v. Wessom, 77 N. J. Eq. 537, 30 L. R. A. (N. S.) 872; Severson v. Kock, 159 Iowa, 343; In re American Knit Goods Co., 173 Fed. 480; Smith v. Richards, 13 Pet. 26; Henderson v. Bank, 112 Fed. 944; Galespie v. Gray, 230 S. W. 1027. (5) The defendant Cole and other directors, on the clearest principles of both law and equity, had no right to adopt a non-dividend paying policy extending over a period of seven years for the purpose of buying new plants not contemplated within the scope of the original undertaking except upon the ground of necessity. This policy could only rightfully be adopted where to do otherwise would result in a failure and consequent loss to the stockholders, to sustain such a doctrine would be to put it in the power of the directors to compel each stockholder to contribute a greater amount to the joint venture than was originally contemplated, hence they would clearly be entitled to adopt this policy only where the necessities of the case required it, and if they could raise the necessary funds by the sale of stock, and the bringing in of new capital into the venture it was their duty to do so. While the right to have a market for the sale of one's stock is secondary to the rights and necessities of the corporation, it is undoubtedly a valuable right which must be respected and will be protected by the courts. The *jus disponendi* is one of the most essential elements of property; this idea is very clearly and fully brought out in a case decided by the Court of Appeals of this Circuit. Gamble v. School District of Allison, 146 Fed. 113.

*A. W. Thurman, John F. Goshorn* and *Mann & Mann* for respondents.

(1) Plaintiff was not injured and not being injured is not entitled to damages. The gist of the action is the damages and not the conspiracy and the damages must appear to have been the natural and proximate consequence of defendant's action. 12 C. J. 581-582; Ross v. Mineral Land Co., 162 Mo. 317, 331; Darrow v. Briggs,

261 Mo. 244, 276; Conran v. Fenn, 159 Mo. App. 664, 677. Plaintiff founds his right of action on conspiracy and is bound by the allegations in his petition. Walsh v. Walsh, 226 S. W. 246. (2) While fraud may be inferred when it is a legitimate deduction from all the facts and circumstances, it is not to be presumed. A transaction which consists as well with honesty and fair dealings as with a fraudulent purpose is to be referred to the better motive. Garasche v. McDonald, 103 Mo. 10. The burden of proof rests on the plaintiff who must make out his case by clear and convincing evidence. Walsh v. Walsh, 226 S. W. 242. And doubts existing as to the construction given to the conduct of the parties, such doubts should be resolved in favor of the defendants. Webb v. Darby, 94 Mo. 629; State ex rel. v. Shelton, 249 Mo. 698. (3) Directors of a corporation, and they alone, have the power to declare a dividend of the earnings of the corporation and to determine its amount. Courts of equity will not interfere in the management of directors unless it is clearly made to appear that they are guilty of fraud or misappropriation of the corporate funds, and when directors have exercised this discretion and refused to declare a dividend there will be no interference by the courts with their decision unless they are guilty of willful abuse of their discretionary powers or of bad faith, or of a neglect of duty. Dodge v. Ford Motor Co., 170 N. W. 668; Cook on Corp. (7 Ed.) 545. Profits earned by a corporation may be divided among its shareholders, but it is not a violation of the charter if they are allowed to accumulate and remain invested in the company's business. The directors are impliedly invested with the discretionary power with regard to the time and manner of distributing its profits. They may apply profits in payment of floating or funded debts or in development of the company's business and so long as they do not abuse their discretionary powers or violate the company's charter the courts cannot interfere. Marawetz on Corp. (2 Ed.) sec. 477; Park v. Grant Locomotive Works, 40 N. J. Eq. 114; Baker v. Backus, 32 Ill. 79; Rothwell v. Rob-

inson, 47 N. W. 255; Ellerman v. Ry., 23 Atl. 287; Park v. Locomotive Works, 40 N. J. Eq. 114, 45 N. J. Eq. 244; 2 Purdy's Beach on Private Corp. sec. 435; Brundage v. Brundage, 60 N. Y. 544. (4) Officers of corporations are not chargeable with loss sustained by a stockholder in diminution of the value of the stock alleged to have been caused by mismanagement of the officers unless it very clearly appear that the loss was occasioned by their gross negligence or willful misconduct. Neall v. Hill, 16 Cal. 145. (5) While directors occupy a trust relation to the corporation or to the corporate property, their duty does not apply to stockholders in the sale and purchase of stock. Dealing in its own stock is not a corporate function. In buying or selling stock directors may trade like an outsider provided they do not affirmatively act or speak wrongfully or intentionally conceal facts with reference to it. Wann v. Scullin, 210 Mo. 429; Shaw v. Cole Mfg. Co., 132 Tenn. 210, L. R. A. 1916B, 706; Walsh v. Goulden, 99 N. W. 406; Carpenter v. Danforth, 52 Barb. 581; Commissioners v. Reynolds, 15 Am. Rep. 245; Steinfeld v. Nielson, 139 Pac. 879; Hooker v. Midland Steel Co., 74 N. E. 445; Bawden v. Taylor, 98 N. E. 941; In re Shreveport National Bank, 43 So. 270; Crowell v. Jackson, 23 Atl. 426; Sperrings Appeal, 71 Pa. St. 20; Krumbhaar v. Griffiths, 25 Atl. 64; Haarstick v. Fox, 33 Pac. 251; O'Neile v. Turnes, 73 Pac. 692.

GRAVES, C. J.—The petition in this case is long and full of details. Learned counsel for the appellant has made a short outline of the pleadings, which, although in very general terms, will very well suffice for that portion of our statement. Such outline is as follows:

"This is a suit in equity by the appellant, John T. Woodruff, filed June 3, 1919, in which he seeks to have cancelled, rescinded and set aside the sale by him of two hundred and sixty-five shares of stock in the United Iron Works Company made in October, 1915, on the ground of fraud, both actual and constructive. The general outline of the facts alleged in the petition are that the defendant Cole, from the formation of the United

Iron Works Company in 1903, was constantly a member of the board of directors, a member of the executive committee provided for by its by-laws, and president of the corporation, during all which time he entirely dominated and controlled the policy of the company as much so as if he had been its sole owner, and that after creating a large amount of indebtedness by making a number of extensions and additions to the property he in 1907 purchased a plant at Joplin, incurring a large indebtedness, not contemplated by the original incorporation of the United Iron Works Company (hereinafter referred to as the defendant company); that he and others acting with him adopted the policy of refusing to pay dividends with the fraudulent purpose of depreciating the value of the stock and enabling them to purchase it at a small fraction of its actual value; that in pursuance of this policy no dividend was paid on the stock from June 1, 1907, to June 1, 1914; and that on account of the official position of the defendant Cole, to-wit, president of the defendant company, member of its board of directors and chairman of the executive committee, and the fact that he was permitted to and did dominate entirely the policies of the company, such facts constituted him a trustee, which disqualified him from purchasing the stock of the appellant without making full disclosures of all material facts within his knowledge.

"That the appellant Woodruff had constantly unsuccessfully attempted to induce the defendant Cole and others acting with him to pay reasonable dividends on the stock out of the earnings so that there would be a market value for the stock, but that he fraudulently refused to do so and after having pursued the non-dividend-paying policy for a period of eight years, on the eve of discontinuing the policy he secretly and clandestinely purchased the appellant's stock through the defendant LeBow as a straw man at the inadequate consideration of fifty cents on the dollar, when it was reasonably worth two dollars for one, and that he had conspired and confederated with the defendants and other

persons constituting the board of directors to adopt the non-dividend-paying policy for the purpose of depressing the value of the stock and to enable him and others to purchase it for an inadequate consideration.

"The petition proceeds upon the ground of both actual and constructive fraud growing out of the relationship of the defendants to the corporation and their control over the property. It is quite lengthy and sets out a number of details which it is not necessary to mention here, especially as there was no point made on the petition in the trial court.

"The answer of all the defendants was a general denial, except that the defendant corporation, in addition to a general denial, alleges that prior to the filing of the appellant's petition, all of the holders of its issued and outstanding capital stock had in good faith agreed with the defendant Cole, acting for and as their agent, to exchange all of their said shares for shares of capital stock of a new corporation for the purpose of taking over the business and assets of the defendant corporation, and that the said agreement had been carried out on July 1, 1919.

"The trial court made a written finding of facts finding that there was no fiduciary or trust relation existing between the defendants and the appellant, and neither was there any actual fraud in the transaction entitling the appellant to have the sale set aside so as to permit him to redeem his stock. The appellant took the necessary steps, as shown by his abstract, to bring the case to this court on appeal."

The learned chancellor made a finding of facts, as above indicated, which covers seven pages of printed matter. These findings cover the many detail charges of facts in the petition. The findings aforesaid include some findings as to the law. The concluding portion of these findings read:

"According to the general principles of corporation law the full title, legal and equitable, to corporate property is in the corporation. Corporate property may be.

real, personal or mixed. The full title, legal and equitable, to shares of stock is in the shareholders. A share of stock is always personal property. A stockholder has no dominion over the corporate property, but he has full and complete dominion over his shares.

"The directors are the agents or trustees of the corporation for the management of the corporate property and are charged with the duties and are subject to the liabilities and disabilities of fiduciaries.

"The directors are accountable for these duties, not to the stockholders, but to the corporation. The directors' activities mainly relate to these duties. But the directors as agents owe some duties directly to the stockholders. They owe the duty of paying a lawful dividend. They owe the duty of not depressing the value of corporate shares by their corporate acts. They owe the duty of recognizing the proprietary rights of a stockholder in his stock. And they owe the duty to a stockholder of accounting to him on the dissolution or final settlement of a corporation for his full proportionate part of the net assets of the corporation. In all these several respects they are agents or trustees for the shareholders. And if they acquire the shares of a shareholder in violation of these duties they acquire them subject to the disabilities and liabilities of trustees.

"As the court understands the relation of directors to the corporation and its stockholders they are trustees of the corporation in their acts about the corporate property. And they are trustees for the stockholders in their corporate acts that affect the stockholders' share in violation of the duties that they owe to stockholders. If the directors acquire the corporate property in violation of their duties as trustees for the corporation they take title to that property subject to the liabilities and disabilities of trustees and are accountable to the corporation. If the directors acquire title to the stockholders' shares in violation of the duties that they owe as directors of the corporation to the stockholders they are subject to the liabilities and disabilities of trustees and are

accountable to the stockholders as trustees.  But other-
wise the directors can buy the shares of a stockholder as
freely as another, because they are not the agents of the
stockholders for the sale of their shares.

"Applying these principles it is difficult to see how
directors of a corporation can escape liability for their
wrong-doing.  Also applying these principles to the facts
of this case the court finds that the defendants acquired
a valid title to plaintiff's two hundred and sixty-five
shares of stock."

From the foregoing it would appear that the chan-
cellor recognized a part, if not all, of the plaintiff's law,
but uprooted him upon the facts.  The decree as indi-
cated was one dismissing plaintiff's bill.  Details are left
to the opinion.

I.  A few facts should be stated.  Defendant corpo-
ration was organized, according to the articles of asso-
ciation, by consolidating three other corporations, to-wit:
Aurora Foundry & Machine Works, Crescent Iron Works,
and Sterling Iron Works, the two latter at Springfield,
Missouri, and the former at Aurora, Missouri.  Accord-
ing to these articles of association, the properties of the
respective plants were put in at the following sums:

| | |
|---|---:|
| Aurora Foundry & Machine Works, | $189,900.00 |
| Crescent Iron Works .......... | 300,625.00 |
| Sterling Iron Works .......... | 163,475.00 |
| | |
| Total. .................. | $650,000.00 |

Thus it appears that the capital stock of the defend-
ant was fixed at $650,000, paid up by the properties afore-
said, and this stock was divided into shares of $100 each.
The appellant, John T. Woodruff, and W. O. Oldham, a
bank examiner, seem to have made these appraisals of
the property, and some time later, as counsel put it, the
water was taken out by charging off values that were
never in there to begin with, and which had been suffered
by depreciation.  To our way of thinking this is not very
material, but that the property was overvalued in the
beginning is evidenced by the fact that its stock was

then sold at from $33\frac{1}{3}$ to 50 cents upon the dollar. Other properties were bought, one about the time of the consolidation, and the defendant company immediately floated a $250,000 with which to pay for the new purchase, outstanding liabilities of the original companies of $100,000, and for working capital. The general policy of the defendant corporation, or of its management, was to use its earnings by way of expansions, rather than using them all in dividends. At most of the annual stockholders' meetings the management was approved by resolution. Substantial dividends were paid up to 1907, the year of the panic, but more substantial portions of the net earnings were used in expansions of the original and acquired plants (of which there were several) in remodeling and modernizing machinery and working instrumentalities, and in maintaining a working capital. From 1904 to 1914 the appellant was one of the directors of the corporation, and attended most of the directors' and stockholders' meetings. He took an active part in these meetings and in the discussion of the corporation interests and property. There is nothing to show that he was not as fully advised as to all matters pertaining to the corporation as any other director upon its board. From 1907 to 1914 there were no dividends paid. During all the years the policy had been expansion, rather than dividends, and this policy continued until 1919, when the property of the defendant was turned over to a Delaware corporation, organized for the purpose, which new company was called, United Iron Works, Inc. It should be said, however, that during some of the years from 1907 to 1915, the United Iron Works Company failed to earn as much as it expended. From 1904 to the time of the sale of his stock the appellant received annual reports of the corporation, and its divers transactions. It must be noted that from about 1909 the appellant was insisting upon the management to pay dividends. However, about ninety per cent of the stock persisted in the original idea of putting away as much as possible in the

way of expanding the business. With these general out-
lines, we leave the specific points to other paragraphs.

II.   Learned counsel for appellant, in the brief, says
that the action is one "to rescind and to have cancelled
the contract of sale made by Mr. Woodruff, when he dis-
posed of his 265 shares of stock in October, 1915, on the
ground of fraud, both actual and constructive." At the
election of directors in 1914, Woodruff and his ticket was
defeated by a vote of only 551 votes out of 5,736 votes
cast. He had been off of the board of directors a little
over a year, but he got the report, and says "the books
of the company that they submitted in their various re-
ports showed it [the stock] was worth $200 per share."
It thoroughly appears that Woodruff was persistent in
his demands for dividends from 1909, forward, and some
of the last meetings were more or less boisterous because
of the fact. There were seven members of the board, and
apparently all stood by Cole in the idea of expanding and
building up a big business concern, except Mr. Wood-
ruff. Not only so, but ninety per cent of the voting
stock was adhering to that idea of the business. It ap-
pears that just after his retirement from the board of
directors Woodruff tried to sell his stock to Cole, but
Cole declined to buy. In September, 1915, he offered
some of his stock to Starr at 75 cents on the dollar. Starr
wrote him that "while the stock is worth $75 per share,
yet I understand there are small lots of stock selling now
and then at $50 to $60 per share." In the same letter
he said that he knew of no buyer at the time, but would
keep his letter in mind. Woodruff testified that he was
in financial straits and needed money. That he tried
to sell his stock to several holders of stock in Spring-
field. The record shows that Woodruff from 1904 up
to 1908, bought and sold quite a number of shares of
stock, but finally wound up with 265 shares, in his name,
and 10 shares in the name of his wife. When he was
buying and selling the prices ranged from $33\frac{1}{3}$ to 75 cents
upon the dollar. He says: "I attended all of the an-

nual meetings of the stockholders from the time of the organization of the company up to and including the year of 1914, the year prior to the sale of my stock. I was *entirely familiar* with the assets of the company from *personal inspection* and as shown by the annual statements, I had been on the board from the organization up to July 1, 1914.''

In addition to this it appears that he got the annual statement of 1915, after he left the board. According to Woodruff, defendant Starr ''never sat on the board but one time before I was put off.'' It is reasonably clear that Woodruff was put off of the board because he and a few other stockholders were opposed to the policy of the company which was supported by ninety per cent of the stock. With these things in mind let us approach the actual sale of the stock. Defendant LeBow was a mere manager of the plant of defendant corporation, and in addition a stockholder in it. He had been a stockholder since 1904. His stock account shows that he acquired 103 shares March 17, 1904, and acquired 10 more shares in 1906, and sold 75 shares the same year. In 1907 he acquired 40 shares and sold 19 shares and 40 shares and his account ran along this way from year to year, until in June, 1915, he had on hand 100 shares. The highest he ever had at the close of any one year was 136 shares, as we read his stock account. July 12, 1911, he had bought from appellant Woodruff 85 shares. Woodruff was in Joplin on October 1, 1915, and wanting to sell his stock, and recalling LeBow had bought stock of him at one time, he called up LeBow over the phone and asked him to come to the hotel where he, Woodruff, was stopping. LeBow did not get in until late, but met Woodruff in the lobby of the hotel, when and where he was approached by Woodruff to buy his stock. LeBow told Woodruff that he didn't think that he wanted the stock; that he wasn't in position to buy it. Woodruff priced it to him at 75 cents on the dollar, and LeBow said: ''It's worth more money than that, but I don't want to buy it.'' LeBow further testified that he didn't have the

money, and was not really considering the purchase. After talking awhile and Woodruff still pressing the sale, LeBow asked what he would take for it, "and the result was I said that if he would consider fifty cents I might think it over if I could borrow the money, and he told me if I could get it by to-morrow noon, which was Saturday, October 2, he would take it." This talk was between five and six; o'clock in the evening, and LeBow went up the street to the Miners' Bank to see if he could borrow the money from that bank, through Mr. Murray, who was an officer of the bank. He says he went there because he had some money borrowed at the Conqueror Trust Company. He did not find Murray at the bank, but looking across the street he saw Mr. Starr in the office of the Conqueror Trust Company, and he there practically arranged to get the money from the Conqueror Trust Company, but Mr. Starr said he wanted to talk it over with Mr. Houk. LeBow went back in the morning and was told that he could get the money, and he thereupon wired to Woodruff that he would take the stock. To which telegram Woodruff replied by letter of date of the 4th of October, as follows:

"Your wire received. I am collecting my shares and will have them ready to send to you by Friday, this week. I could attend to the matter earlier if I were not going away, but I will be out of town until Thursday, and shall not be able to get everything together before leaving."

Woodruff got his stock together, and had the Holland Bank forward it with sight drafts attached for the price agreed upon as above stated. These reached Joplin on October 11, 1915, at which date LeBow made and executed a demand note for the amount of the drafts, and deposited the stock as collateral to his note, and the drafts were thus paid through the Conqueror Trust Company. Thus closes the stock deal, except a later transaction urged by appellant, which we will state and discuss with appellant's chief legal contention.

III.    Appellant contends that as this is an equity case, we should try it *de novo* here. Such is the law,

307 Mo.—3.

but we usually yield to the judgment of the chancellor *nisi*, where there is a disputed question of fact, and the evidence thereon is oral. We shall determine the case under the oft-repeated rules applicable to equitable cases.

During all the years, defendant Cole was president of the corporation, a member of the board of directors, and chairman of the executive committee, and a large stockholder. From about 1913 Starr had been a director, and from October 5, 1912, a stockholder. De-

Presumptive
Fraud.

fendant Houk had been a stockholder from October 26, 1912, and defendant LeBow a stockholder, as said above, from March 17, 1904, and since 1907 the manager of the Joplin plant of the defendant corporation. Neither LeBow nor Houk had ever been a director. The chief legal contention of appellant is that defendants Cole and Houk, being managing officials of defendant corporation, stood in a fiduciary relation to each individual stockholder, and could not buy stock from such individual stockholders, without first having made full disclosures. In view of this contention as to the law appellant insists that LeBow, in the purchase of this stock, as he did by his telegram of October 2nd, was the agent and "straw man" of Cole, who throughout is charged as the chief villain in the case. Learned counsel for the appellant makes one of the most ingenious arguments and presentations of both the facts and the law we have read in years. One reading it is bound to say "almost thou persuadest me." But we must deal with the cold facts as we find them. The learned counsel insists that the transactions after October 11th shows that LeBow was the mere tool of Cole or of Cole and Starr. On November 2nd, the following agreement appears:

"AGREEMENT

"Joplin, Missouri,
"November 2, 1915.

"It is hereby mutually agreed by all of the undersigned parties hereto that each shall share in the ownership of two hundred and sixty-five shares of the capital

stock of the United Iron Works Company, which has been purchased from J. T. Woodruff by Loy T. LeBow at fifty dollars per share on October 11, 1915, provided that each party hereto shall pay his pro-rata share of said purchase price and the interest and expense which may be incurred on account of said purchase.

"Said Loy T. LeBow and C. H. Cole having arranged for and furnished the purchase price for said stock. It is hereby understood and agreed that J. G. Starr and Wm. Houk shall each execute a note for $2500 bearing date of October 11th, 1915, and payable in four months, with interest at six per cent from date thereof as evidence of their obligation to take fifty shares each of said stock and their rights to receive same from said LeBow and C. H. Cole, when said notes or any renewal thereof are paid, and same shall be made payable one to Loy T. LeBow and one to C. H. Cole and shall be non-negotiable.

"In witness whereof, we hereunto subscribe our names this 2nd day of November, 1915.

"Loy T. LeBow,

"C. H. Cole,

"J. G. Starr,

"Wm. Houk."

This was offered by the defendants, and it is shown by the oral evidence that upon that day, November 2nd, Cole signed the note which LeBow had given on October 11th. The defendant Starr and Houk executed the notes called for in the contract, as of date October 11th, as required by the contract, but they were executed on November 2nd. The reason for that was to make their notes bear interest from the same date as the purchase-price note, as they were getting the stock at the purchase price. So runs the evidence of the four individual defendants. This note first signed by LeBow on the 11th was for $13,250, and was a demand note. The notes made by Houk and Starr were made to Cole and LeBow, because they as officers did not want to borrow from their Trust Company. By August 5, 1916, Houk had paid his $2500, and Cole had paid his $4,150, which was ap-

plied to the original note of $13,250, and on that day, August 5, 1916, the old note was cancelled and a new note of $6,600 given. This new note was paid June 18, 1917, by Starr, who upon that date paid for his own stock, and bought LeBow's 82 shares at their face value. The profit of $4,100 was to LeBow. June 28th, thereafter, LeBow borrowed from the Conqueror Trust Company $8,625 with which he purchased 75 shares of stock belonging to Hornsby, one of the original stockholders, and this stock was purchased at $1.15. This fact is emphasized by the appellant.

At the director's meeting December 14, 1915, a resolution was passed "that a dividend be declared at six per cent annually, payable one-half of one per cent monthly on the capital stock of the company on the 20th of each month and to begin December 21st, 1915, and continue monthly thereafter until such time as the board decides otherwise." Hornsby tried to amend the resolution so as to make it four per cent annually, but the amendment failed for a second, and the original resolution, as stated above, was passed by the votes of Cole, Woodruff, Starr and Daily, but Hornsby voted against it. The character of this motion and its date is emphasized. Appellant then correctly states and emphasizes the following facts:

"On June 30, 1916, an extra dividend at one per cent, to be paid at once to the stockholders of record June 1, 1916, was declared.

"On November 20, 1916, an extra dividend of two per cent on the capital stock, payable on December 1, 1916, was declared.

"On July 1, 1918, an extra dividend of four per cent on the capital stock, payable to stockholders of record as of June 1, 1918, and payable June 1, 1918, was declared.

"The dissolution dividend or the terms of sale of the property of the defendant company to the Delaware corporation, which was made June 25, 1919, after this suit was brought on June 3, 1919, was cash $118, pre-

ferred stock $147, common stock $50, or a total of $315 per share, less five per cent for expenses.''

From the foregoing facts is predicated the alleged fiduciary relation, and its breach, to appellant's damages.

On the other hand it appears that Cole and the other directors were buying and selling stock all along, and that the highest price Cole ever got for stock sold by him was sixty cents on the dollar. He sold in 1912, 1913 and 1914, the three years preceding Woodruff's sale of stock. The facts are that during the first four years after the incorporation of the defendant corporation, the net earnings lacked only $23,000 of being as much as they were in the following eight years. Dividends were paid these first four years. Each of the four individual defendants testify that LeBow bought the Woodruff stock in his own account, and was not the agent of Cole or Starr, or of any other person. LeBow said he was worth $20,000, and was satisfied that the stock was worth more than he had paid for it, but he was dubious of carrying a load of $13,250, which his note called for, and that he talked to Starr about it, and asked him if he would not buy of him a part of it at the price paid. Starr was not much interested and told him that Cole might take a part of it, and LeBow says that he called up Cole on the phone, but that Cole was not enthusiastic, but said he might take some of it. LeBow had asked Starr to talk to Houk. The result of it all was that LeBow got Cole, and they went to the Conqueror Trust Company, where finally the agreement of November 2nd was made. According to the others present (and all the individual defendants were present) even then Cole said that he did not care for the stock, and for Starr and Houk to take all they wanted, even if none was left for him.

Trying this case *de novo,* on all the facts in this lengthy record, we cannot well say that LeBow bought Woodruff's stock as an agent for Cole, or for Cole, Starr, Houk and himself. Under the facts we must rule that LeBow bought the stock for himself. Even on November 2nd Cole said that he would take no part of it, only

for the fact that it was already financed, as he did not have at hand the money.

With this ruling the main legal contention drops out of the case. LeBow was only a stockholder and an employed manager of one of the many plants then run by the defendant corporation. As between him and Woodruff there was no fiduciary relation, upon any theory of the law. Appellant only claims the fiduciary relationship on the theory that LeBow was a mere ''straw man'' for Cole and Starr. We can't find this under the evidence of these four men, and this evidence is undisputed, and unimpeached. In this our conclusion may be more drastic upon appellant than those of the learned chancellor below, but we cannot ignore the facts. Appellant depends upon circumstances solely to destroy this evidence. The circumstances shown, which we have outlined, are not sufficient to show that LeBow was not in fact the purchaser of this stock. So, interesting as is the learned argument of distinguished counsel, we need not rule upon the direct question as to whether or not a director or managing officer stands in such close fiduciary relationship to the individual stockholder of his corporation, that such officer would have to make full disclosures of all facts he knows, before a valid purchase of stock could be made from the stockholder. That interesting question drops out of the case upon the facts, and should be left to a live case for consideration. Appellant's counsel urges that the exact question has never been ruled by this court. Perhaps not, but we have closely approached it.

Even conceding that the rule of law is as broad as counsel contend for in his most excellent briefs, the appellant must lose in this case. Appellant admits that he knew all about the properties of the company by virtue of physical inspections, and that he knew the book value of the stock was two dollars or more. So, even if Cole had bought the stock, he withheld nothing from Woodruff. There was nothing for him to withhold. Woodruff knew the facts which the rule of law contended for

would. require Cole to disclose. If a stockholder knows the facts, then the rule invoked would not avail him. It might be a technical violation of the law, but the stockholder could not be damaged if he knew the facts, which the rule required the officer to disclose. On this point the plaintiff's case fails.

IV.  In the foregoing we have disposed of the question of presumptive fraud, and it only remains to dispose of the question of actual fraud. The trial court rightfully found that there was no evidence to sustain the idea that there was a conspiracy (with Cole as the arch conspirator) to depress the value of the stock for the purpose of buying it up. Many of the facts are included in what we have said. There was a division of the stockholders on the policy of the corporation. Ninety per cent of the stock favored enlarging the business of the corporation by using most of the earnings in betterments, and in the purchase of new plants. Plant after plant was purchased, and thousands of dollars expended in betterments, and all while Woodruff was on the board of directors. At practically each annual meeting of the stockholders this policy was ratified in Woodruff's presence and with his participation. His one contention was for dividends, but failing in that, he participated in these expansions, and in his testimony here, says that there was no fraud in the expenditures.

*Actual Fraud:*

In addition, during a portion of the eight years, during which, practically no dividends were paid, it is questionable whether or not they could have afforded to pay. The real question was the policy of the corporation, and this policy was not fraudulently foisted upon the minority stockholders. Cole's idea was to build up a big concern, and in this ninety per cent of the stock concurred, not fraudulently, but because they believed in Cole and his policy. The net result of the policy was that those holding stock when the defendant corporation came to make the transfer to the Delaware corporation in June, 1918, the stockholder got in stock and cash $315 on each

$100, less five per cent for expenses. Appellant's wife held her ten shares, and got this result.

The World War began in 1914 and the result was that as soon as Europe began to exhaust her supplies, the corporations of this country began to reap a harvest. This is current history. Defendant corporation shared in that prosperity and made great strides from 1916 forward. Appellant could judge of what might happen as well as others.

The voluminous record in this case will be read in vain for actual fraud.

The judgment shall be affirmed and it is so ordered. All concur.

PER CURIAM:—The foregoing opinion by GRAVES, J., in Division, is adopted as the opinion of Court in Banc. All concur except *Walker, J.,* absent, and *White* and *Woodson, JJ.,* who dissent.