JESSE KELLY v. INDUSTRIAL OPERATING COMPANY, Appellant.—46 S. W. (2d) 181.

Division One, February 11, 1932.

*Grant I. Rosenzweig* and *Harry Howard* for appellant.

*John C. Nipp, B. B. Anderson* and *Leon L. Handley* for respondent.

ATWOOD, J.—This case has been twice heard here and comes to the writer on assignment after rehearing. We acknowledge our indebtedness to the writer of the opinion first submitted, for a painstaking, unchallenged statement of the case, from which we shall freely draw without use of quotation marks.

Jesse Kelly brought suit against Industrial Operating Company, a corporation, and Kansas City Laundry Service Company, a corporation, on ten promissory notes, each given in the principal sum of $496.60 and dated February 26, 1916, five of them being due one year after date, five due two years after date, and all made payable to the order of J. B. Schmeltz. Each of the notes was signed "Woolf Bros. Laundry, by L. B. Reynolds," and each bore the endorsement "Pay to Jess Kelly or order, J. B. Schmeltz."

The petition was in ten counts and charged that defendant Industrial Operating Company, a corporation, at and prior to the transactions leading up to the making of these notes, owned and operated a number of laundries and among them one operated under the name of Woolf Brothers Laundry in Kansas City; that said Industrial Operating Company was under the personal supervision of L. Reynolds, its principal stockholder and managing officer, who conducted the laundry, transacted all business done under the name of Woolf Brothers Laundry, and executed the notes in question; and that plaintiff purchased the notes for value and before maturity. The petition further alleged in each count that after the execution and delivery of these notes the said Reynolds, as principal owner and manager of said Industrial Operating Company, joined in the organization of the Kansas City Laundry Service Company, and that all the properties of the Industrial Operating Company were taken and accepted for stock in the Laundry Service Company, and that this was done without making any provision for the payment of the notes sued on; that the property so absorbed by the Kansas City Laundry Service Company became a trust fund in its possession for the payment of the indebtedness due plaintiff and that said Kansas

City Laundry Service Company was liable to plaintiff for the amount due on the notes.

The answer of the Kansas City Laundry Service Company was merely a general denial. The Industrial Operating Company by its separate unverified answer, made general denial of the allegations of the petition, and denied the execution and delivery of the notes sued on, and alleged that all the indebtedness at any time existing to J. B. Schmeltz, or plaintiff Kelly, had been fully paid long before the filing of the suit. The answer further pleaded want of any consideration for said notes; that the notes were founded solely on usury on the part of J. B. Schmeltz, and that usury was the sole basis and consideration for each of said notes; that plaintiff was not the real party in interest; that the transfer to him was without consideration, and was made in an endeavor to defeat proper defenses of defendant Industrial Operating Company, and that the notes were acquired by Kelly in bad faith and were void. The answer further alleged that the notes resulted from a large number of transactions, all involving usury and covering a period of more than four years; and defendant asked that Schmeltz be made a party to the suit, that defendant have an accounting with plaintiff and said Schmeltz, that the notes be declared void and be cancelled, that defendant have judgment for any amount of overpayments because of said usury, and have judgment for attorney's fees, and "for all other relief, which, to the court, may seem just and proper." The reply was a general denial.

The suit was filed in the Circuit Court of Jackson County, December 21, 1918, but was not tried until February, 1926. Schmeltz was not made a party to the suit. The cause was tried by the court, and at the close of all the evidence plaintiff dismissed as to the Kansas City Laundry Service Company with prejudice. The defendant asked certain declarations of law which were refused, and certain others which were given. The defendant also in writing requested the court to state in writing his finding of facts and conclusions of law, and the request was marked as granted. The case was taken under advisement by the court, and afterward, in September, 1926, judgment was rendered for plaintiff upon each count in the sum of $893.88, upon a general finding under each count. After unsuccessfully moving for a new trial and in arrest of judgment defendant Industrial Operating Company appealed.

Upon the trial it was admitted that the Woolf Brothers Laundry was one of the plants operated by the Industrial Operating Company. The plaintiff offered the notes sued upon and they were admitted in evidence. Plaintiff then took the stand in his own behalf and testified that the endorsement on each of the notes was the endorsement of J. B. Schmeltz. He then put in evidence a letter written by him, sent by registered mail, dated February 17, 1917, addressed to Woolf

Brothers Laundry and L. Reynolds, at Kansas City. In this letter he gave notice to the addressees that he had purchased and was the owner of the ten notes, describing them, and stated that if the makers paid the notes to any one else he would hold them responsible therefor, and that if the amount of the five notes due on February 26, 1917, was not remitted to him, suit for their collection would be brought without further notice.

Plaintiff was cross-examined at length concerning his acquisition of the notes, and he testified that he was forty-one years old, had been in the restaurant business in Kansas City for about fifteen years and had known Schmeltz for about twenty years; that Schmeltz had a store at 1231½ Grand Avenue where he dealt in jewelry, watches and clocks, and that he had a sign on the window and also a sign over a clock in the place reading, ''Money to lend.'' Plaintiff's restaurant was situated about two blocks from the Schmeltz establishment. Plaintiff said he had occasionally made purchases from Schmeltz of jewelry and other articles to an amount as high as $150. He testified that at the time of buying the notes there was a vacant room back of his restaurant, and he conceived the idea that if he had the money he would open up the room and enlarge his restaurant; that he talked to Schmeltz about it and Schmeltz asked what security he had, and plaintiff told him he had real estate coming to him from his father's estate which he would put up, an interest in a farm in Clay County, and Schmeltz told him he had some notes coming due in February that he would trade; that they went over to Clay County and looked at this farm, and that Schmeltz ''seemed pretty well satisfied;'' so that, along about the 7th or 8th of February they made a trade.

The farm consisted of forty acres with improvements, but the improvements were not shown to be of a particularly valuable character. Plaintiff owned a one-ninth interest therein by inheritance, and had bought the one-ninth interest of a brother, and the one-ninth interest of a sister, paying to each of them $300 for such interest. Plaintiff said that he turned over to Schmeltz one of the deeds he had received so that Schmeltz could prepare a deed to be executed by plaintiff and his wife to Schmeltz; that Schmeltz prepared a deed which plaintiff signed, but not before a notary; that Schmeltz lost this deed and also the deed given him for use in preparing it; that they went over to Liberty and he and his wife there executed and delivered a deed of conveyance of his three-ninths interest in the forty acre farm, to Schmeltz. The consideration recited in this deed was $2,000, but plaintiff gave no clear explanation of the amount of the consideration recited, or what instructions, if any, were given on that subject. This deed was executed on the 24th day of February, 1917, which was two days before the maturity of the five notes first matur-

ing, and seven days after the date of the letter written by plaintiff to the Laundry notifying the Laundry he had purchased the notes. He said he had the notes in his possession at the time the letter was written; that it was written for him by an attorney; that the notes were turned over to him at the time he delivered the deed to Schmeltz for the purpose of preparing the deed to be signed. Plaintiff testified that at one time $8,000 had been offered for the farm; that at the time of the trade with Schmeltz land was rapidly advancing in value. The land was sold in 1922, in a partition proceeding instituted by Schmeltz, and brought $4,000 at sheriff's sale. The report of the sale showed Schmeltz received for his share, after deduction of costs, the sum of $1263.67. Plaintiff testified that Schmeltz told him nothing about the origin of the notes and says he made no inquiry of Schmeltz about the history of the notes or the worth of the maker, and made no inquiry of anyone else. He said that he had seen the Woolf Brothers Laundry wagons and thought it was a big concern that would be able to pay the notes as soon as they were due, and thought notes taken by Schmeltz would be all right. He says he "knowed Schmeltz loaned money on jewelry, watches, and such as that," but knew nothing about the pawnbroking business; that he trusted Schmeltz and "formed his opinion the notes were good and all right or Schmeltz would not have taken them." He said that although there was an abstract of title to the farm he did not get it, or give Schmeltz an abstract. There was an abstract, he said, over in Clay County, but he did not know whether Schmeltz ever saw an abstract, but said Schmeltz "looked it up." He testified that at the time he traded for the notes, the time when he had said he had wanted money to enlarge his restaurant, his wife owned real estate worth $3,500 to $4,000, and also had personal property, money loaned out, to the amount of $6,000, but says he did not consider borrowing from his wife. He took no steps to hold Schmeltz liable under the latter's endorsement of the notes. In the course of his cross-examination he was asked to state if he knew to whom the three-ninths interest in the farm went. He said: "Oh, it must have all went to Mr. Schmeltz, and there was a lot and house sold in town for $1500, and I never got nothing "out of that at all, it all went to him." No further inquiry was made or other testimony introduced concerning this house and lot in town. None of the deeds or documents introduced contained any reference to a house and lot in town. Plaintiff denied that he had asked Schmeltz for a return of the money received by Schmeltz and said he was depending solely on collecting the notes. In his testimony concerning the circumstances under which he acquired the notes he spoke only of his interest in the farm as the property traded to Schmeltz for the notes. Schmeltz was not called as a witness, although it appears from the opening statement of counsel that he was living in Kansas City at the time of the trial.

Defendant introduced as a witness a Mrs. Folt, who was an employee of the Woolf Brothers Laundry during the period from October, 1912, when the loan transactions between Schmeltz and the Laundry began, and thence on to February, 1916, the time when the notes were given. The witness testified that she had charge of the books, accounts, checks and papers pertaining to the business of the Laundry. She said the Laundry was in continual straits for money during that period, and borrowed sums of money from Schmeltz for short periods, and the rate of interest to be paid thereon was two per cent per week. She had prepared a statement from the books showing the account with Schmeltz, the sums borrowed and the dates and payments made by the Laundry to Schmeltz and their dates. It appears that ordinarily the principal sum of these numerous short-time loans was soon paid back, sometimes within a week or two, but that as against an interest charge of two per cent a week, the indebtedness of the Laundry accumulated, although it paid to Schmeltz in this period sums equal to the amounts it had borrowed from him, plus interest at about twenty-seven per cent per annum. This statement, prepared by the witness and introduced in evidence, and her testimony, was to the effect that taking these sums borrowed and sums paid, the Laundry had actually received from Schmeltz as the sum total of all the loans, the sum of $12,061.34, and had actually paid to Schmeltz the total sum of $13,346.33, that is, calculating interest on the various loans at six per cent for the time the principal was unpaid, the Laundry had repaid the sum total of all money borrowed, plus interest at six per cent, amounting to $280.02, plus $1004.97; and that calculating interest at eight per cent the Laundry had repaid the principal, plus eight per cent interest, amounting to $373.36, plus the further sum of $911.63; but, that on the basis of calculation of interest at two per cent per week, the Laundry had not paid all of the interest, or indeed all of the principal. The testimony of the witness was that from time to time the Laundry, not having money to pay interest or this so-called principal, gave checks to Schmeltz representing unpaid interest, and unpaid principal founded upon calculations of interest at two per cent per week. In February, 1916, checks of that character, about twenty in number and unpaid, were in the hands of Schmeltz. They amounted in the aggregate to $4,966. The ten notes in suit were given to take up those checks. Plaintiff introduced no evidence to contradict the testimony of Mrs. Folt. There is no serious dispute here of the claim that the notes represented nothing but an excessive and usurious accumulation of interest. The case is presented for plaintiff solely on the theory that plaintiff took the notes for value, before maturity and in good faith.

636

Among the defenses pleaded and now pressed by appellant is the claim that Kelly acquired the notes in bad faith, and hence, was not a holder in the due course, as alleged. Section 2680, Revised Statutes 1929, dealing with negotiable instruments, is as follows:

"A holder in due course is a holder who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face; (2) that he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact; (3) that he took it in good faith and for value; (4) that at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 2683, Revised Statutes 1929, provides that "title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud, duress or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as amount to a fraud." What constitutes notice of infirmity or defect is thus stated in Section 2684, Revised Statutes 1929:

"To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Absence or failure of consideration is a matter of defense as against any person not a holder in due course. [Secs. 2657, 2686, R. S. 1929.] As we have already observed, there is no serious contention on the part of respondent that the notes here in question represented anything but an accumulation of usurious and illegal interest. Such was clearly shown without contradiction at the trial. Hence, the title of the payee, Schmeltz, who negotiated the notes to plaintiff, was defective because the notes were given for an illegal consideration. Section 2687, Revised Statutes 1929, provides that "when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course." Plaintiff took the witness stand and undertook to carry this burden. As defendant followed with no opposing evidence, except as to value of the farm, we may say that the only question before us on this issue of good faith in plaintiff's acquisition of the notes is whether or not he carried this burden.

Counsel for the respective parties agree that we should treat this proceeding as a suit in equity. In equity cases it is not only the

privilege but the duty of this court to examine the evidence and draw our own conclusion of fact as well as of law (Miller v. McCaleb, 208 Mo. 562, 575, 106 S. W. 655), although, where there is a disputed question of fact and the evidence thereon is oral and highly contradictory and conflicting, we are inclined to defer to the findings and conclusions of the trial chancellor because he had the advantage, not shared by us, of seeing and hearing the witnesses as they testified. [Woodruff v. Cole, 269 S. W. 599, 602, 307 Mo. 19; Hoehn v. Hoehn (Mo. Sup.), 297 S. W. 954, 960.] In the instant case, however, plaintiff was the only witness who testified in his behalf, and his testimony was not disputed by either of defendant's witnesses except in the minor detail of farm value. So, on this issue of good faith, it is obviously our duty to examine plaintiff's testimony and, drawing all reasonable inferences therefrom, determine for ourselves whether or not Kelly, before finally parting with the full consideration agreed upon as coming to Schmeltz (Sec. 2682, R. S. 1929), had knowledge of such facts that his action in taking the notes amounted to bad faith.

On cross-examination Kelly said: "About the 7th or 8th of February, we made the trade and he took a deed that I had, was given me and took it over to his place and we made out a deed there, he did, and when we went over there (the Schmeltz store) he had lost my deed and his both . . . and the only thing I said then, 'Well, you didn't have nothing to make out no deed, so we would go to Liberty.' That was on the 17th day of February. So we went over to Liberty and made out the deed." The warranty deed from Kelly and wife conveying his three-ninths interest in the farm land, subject to rights therein of Kelly's widowed mother, to Schmeltz, was dated February 24, 1917, acknowledged at Liberty, Missouri, on the same day, and on the same day filed for record in the office of the Recorder of Deeds of Clay County. Kelly further testified that Schmeltz wrote, "Pay to Jess Kelly or order, J. B. Schmeltz," on each note, and that he got the notes about the 9th or 12th of February when he left the deeds which Schmeltz subsequently lost, and that he had these notes in his possession and presented them to his attorney when he had him write the letter in evidence addressed to Woolf Brothers Laundry & L. Reynolds on February 17, 1917. When asked how he came into possession of the notes before Schmeltz got the deed he was entitled to get, Kelly said: "Because when I turned these deeds over to him he turned over the notes to me." Later, after suggestive interruptions by his attorney, he said that he signed the deed that Schmeltz lost, but admitted that he did not sign it before a notary public and that his wife did not sign it.

Thus, from plaintiff's own evidence, it appears that he knew that he was dealing with an experienced business man and professional

money-lender who readily agreed to make an even exchange of principal indebtedness amounting to nearly $5,000, one-half of which would become due within a few days and the remainder a year thereafter, for three shares of one-ninth interest each in farm land incumbered with rights of the surviving widow of the deceased owner, two of which shares plaintiff had acquired within sixteen months previously for the sum of six hundred dollars, and for all of which he subsequently delivered a deed reciting a consideration of only two thousand dollars; and that, without first obtaining proper conveyance of said land from plaintiff and his wife or written contract therefor, the owner of these notes indorsed and delivered them to plaintiff and permitted him to keep them for days without evidencing the slightest concern on his own part for delivery of the consideration agreed upon as coming from plaintiff. In spite of these highly suspicious facts plaintiff says he never inquired of Schmeltz, the Laundry or any one else as to the consideration given for these notes or the circumstances surrounding their execution and delivery. If he really was as ignorant and unsophisticated as this conduct would imply, it seems incredible that on February 17, 1917, a full week before he and his wife had really parted with any consideration, he would suddenly think of seeking out an attorney and having him advise the maker of the notes before February 26, 1917, the maturity date of five of them, that he had purchased all ten of the notes and was even then the owner of all of them. Furthermore, having consulted an attorney on this matter before he himself had parted with any consideration, it is indeed significant, that he did not ask his advice regarding possible infirmities or defects touching the consideration and circumstances under which the notes were given.

Even accepting plaintiff's testimony, however improbable, as true, we not only think that he failed to carry the burden of proving that he acquired title to the notes in due course, but the evidence taken as a whole clearly indicates that in his acquisition of these notes and before he had parted with any consideration whatever for them he wilfully and purposely avoided convenient and obvious means of obtaining actual knowledge that Schmeltz's title thereto was defective as shown at the trial, and that he had knowledge of such facts that his action in taking the notes amounted to bad faith. His subsequent complacency when the notes were not paid, although he said he bought them in order to get ready cash with which to enlarge his restaurant, his failure to take steps obviously necessary to protect himself on the payee's unqualified indorsement, and his failure to call him as a witness in the case, all plainly point that way.

Counsel for respondent cite cases holding that an indorsee's mere knowledge of facts which would ordinarily put one on inquiry, or

mere suspicion, or mere negligence, unless he acted in bad faith, will not impeach his title. Such may be conceded as good law, but the authorities also generally hold, as stated in Link v. Jackson, 158 Mo. App. 63, 83, 139 S. W. 588, 593, cited by respondent, that "such facts when proven may be considered by a jury in arriving at the ultimate fact of good or bad faith of the plaintiff." See also, 8 Corpus Juris, page 505, sec. 711; Whaley v. Neill, 44 Mo. App. 316, 322. Inadequacy of purchase price also "is always a fact to be considered by the jury as evidence of bad faith, and may, with suspicious circumstances, authorize a finding of bad faith, especially if the consideration is grossly inadequate." [8 C. J. 508, 509, sec. 717.]

Counsel for appellant urge other points, but in view of our conclusion, reached after a careful study of all the evidence, that plaintiff was not a holder in due course and not entitled to recover, they need not be considered.

The judgment is reversed. All concur.