Madison LUCAS et al., Plaintiffs-Respondents,

v.

BECO HOMES, INC., et al., Defendants,

Delta Loan and Finance Company, Defendant-Appellant.

No. 34537.

Missouri Court of Appeals, St. Louis District.

March 13, 1973.

Motion for Rehearing or Transfer Denied April 6, 1973.

Application to Transfer Denied June 11, 1973.

Millsap, Weil & Eyerman, Clayton, for defendant-appellant.

Biggs, Curtis, Casserly & Barnes, Francis A. Casserly, Clayton, for plaintiffs-respondents.

SIMEONE, Judge.

This is an appeal by defendant-appellant Delta Loan and Finance Company, (hereinafter Delta), from a judgment of the Circuit Court of the City of St. Louis entered November 30, 1971. The judgment of the trial court decreed the following: (1) that the plaintiffs recover the sum of $88.55 representing the excess paid on a loan to the plaintiffs plus lawful interest at 6%, together with a fee for the plaintiffs' attorney in the amount of $1,400.00; (2) that the plaintiffs were entitled to recover payments made on the loan since the date of the trial, May 11, 1971; (3) that Delta be enjoined from making any further collections on the loan made by plaintiffs, negotiating the note, or from foreclosing on any security held by Delta with respect to the loan. Delta was directed to deliver to plaintiffs the note signed by them, and to execute and deliver to the plaintiffs a deed to certain real estate originally owned by plaintiffs. The judgment dismissed Delta's counterclaim praying for the balance due on the note. After a motion to amend judgment or for a new trial was overruled on February 4, 1972, Delta perfected its appeal here. We affirm the judgment, order and decree of the trial court.

In March of 1966 Madison and Lora Lucas, husband and wife, saw an advertisement relating to the sale of some surplus homes at Scott Air Force Base near Belleville, Illinois, by Beco Homes, Inc. Stephen Coleman was the president of Beco. Mr. and Mrs. Lucas went to Scott Air Force Base and discussed the purchase of a two-bedroom unit with Mr. Coleman. They entered into an agreement to buy one of these homes from him. According to Coleman the purchase price of the home was $1,995.00. Together with sales tax of $79.80 and a dismantling charge of $140.00 the total price came to $2,214.80. Beco also offered to make a construction loan to Madison and Lora Lucas in the amount of $1,000.00 to aid them in the assembly of the dismantled building when it was delivered to the Lucas' property in Jefferson County, Illinois.[1]

According to the invoice the total agreed price amounted to $3,214.80, including the construction loan. $14.80 of this total was paid in cash, leaving a balance of $3,200.00 to be financed. On March 12, 1966, Madison and Lora Lucas, together with the joint owners of the Jefferson County property, Julius and Hazel Watkins, signed the following documents: (1) a note payable to Beco Homes, Inc. in the amount of $5,411.17; (2) a Quit-Claim Deed to property in Jefferson County, Illinois, which when recorded on April 25, 1966, was to be forwarded to Charles G. Bollinger, Delta Loan and Finance Company, Waynesville, Mo.; and (3) a Bond for Deed signed by Coleman, president of Beco, and the plaintiffs, by which the Jefferson County property would be conveyed back to the plaintiffs if they made payments on the loan. The Quit-Claim Deed and the Bond for Deed were both to secure the payment of the note. The note was to be paid in 84 consecutive installments of $64.42 each commencing on June 5, 1966.

Delta had an arrangement with Beco "to do the financing on the sale of these

---

1. The parties agreed that the law of Missouri is applicable to this proceeding.

homes", and it was agreed that when the homes were sold, and if they were sold on credit, the paper would first be offered to Delta. In due time credit reports were requested on Mr. & Mrs. Lucas and Mr. & Mrs. Watkins, presumably by Beco. On April 22, 1966, Coleman wrote to Charles G. Bollinger of Delta enclosing the note and credit report. In due time Delta wrote to the dealer, Beco, acknowledging receipt of the documents signed by the "purchaser" and showing how the total amount of the note ($5,411.17) was disbursed. The sheet that Delta sent to Beco shows the "time differential" to be $1,251.44,[2] dealer reserve $901.07, credit life insurance $378.-77, a check to Delta in the amount of $1,880.00 and two checks in the amount of $500.00 payable to the dealer, Beco, presumably representing the $1,000.00 construction loan.

Wayne Anderson, the subsequent manager of Delta's Waynesville office, testified that a desk pad dated April 22, 1966, showed that Bollinger had figured Delta's discount price to be $1,251.44.[3] While the amount borrowed by the plaintiffs was $3,200.00, the amount of the note was $5,411.17. The note was negotiated to Delta on April 22, 1966, and Delta discounted the note at 5% add-on interest for a charge of $1,251.44. The balance of the proceeds ($4,159.73) was disbursed by Delta as follows:

1. check dated April 28, 1966, in the amount of $1,880.00 payable to Delta for existing indebtedness of Beco;

2. check dated April 28, 1966, in the amount of $500.00 payable to Beco as part of the $1,000.00 construction loan advance to plaintiffs;

3. check dated April 28, 1966, in the amount of $500.00 payable to Beco for construction loan;

4. check dated April 29, 1966, in the amount of $378.77 for credit life insurance

on the life of Julius Watkins payable to Magnolia Insurance Agency; and

5. $901.07 retained by Delta as part of "dealer reserve" to be held for Beco until the total indebtedness was satisfied.

The life insurance policy was purchased because it was Delta's policy not to purchase an installment note unless the life of the maker was insured.

An authorization to purchase life insurance (unsigned) in the name of Julius Watkins at a total premium of $378.77 was introduced and life insurance was purchased. This was "customary" because life insurance was mandatory on every contract. There is no evidence that Watkins knew anything about this policy.

Sometime in May the home was delivered to the plaintiffs' property in Jefferson County, Illinois, but Beco never gave the plaintiffs the $1,000.00 construction loan for the assembly of the home. The building was never assembled but remained on the property exposed to the weather and deteriorated.

The ledger sheets of Delta on the plaintiffs' account show that the borrower was Julius Watkins and the date of the note was April 25, 1966. The ledger sheets also show the principal amount of the loan to be $3,258.77 ($1,880.00 plus $1,000.00 construction loan and $378.77 life insurance) and the amount of the interest to be $2,152.51 ($1,251.44 discount plus $901.07 dealer reserve). The ledger sheets show the date of the first payment was June 5, 1966, and the maturity date was May 5, 1973. The installments were to be paid in 84 monthly installments of $64.42 each. Plaintiffs made 59 payments totaling $3,800.78.

Plaintiffs filed an amended petition on December 31, 1970, in three Counts. Count I alleged a conspiracy between Delta and Beco; Count III sought the excess

---

2. This figure represents .35 (7 years x 5%) x $3,578 (amount of invoice $3,200 + $378.77 for credit life insurance).

3. There are minor differences in the actual calculations which are not significant for the purposes of this opinion.

usurious interest and attorney's fee; and Count IV prayed that the defendants be enjoined from collecting any further payments and cancel the balance due. Count II which was based on a claim under Illinois law was dismissed.

After a hearing on May 11, 1971, the trial court rendered the judgment on November 30, 1971, that the plaintiffs were entitled to recover all payments made by them in excess of $3,712.20, representing the principal and legal interest at 6% amortized over a five-year period. Thus, judgment was rendered in the amount of $88.55 together with the attorney's fee of $1,400.00 and to the extent that if any payments were made after May 11, 1971, the plaintiffs were entitled to recover such payments.[4] In holding that Delta was a holder in due course, the court also decreed that Delta and Beco be enjoined from making any further collections on the note of March 12, 1966, and from negotiating the note or foreclosing any security held by them. Delta was also ordered to execute and deliver to Mr. & Mrs. Lucas a deed to the Jefferson County property as per the Bond for Deed. The court found that although plaintiffs pleaded a conspiracy in Count I, there was no evidence of any conspiracy or fraudulent scheme.

On this appeal the appellant Delta contends: (1) the trial court erred in finding Delta charged usurious interest because the transaction in which Delta was involved was in fact a "purchase money contract" or a time differential sale to which the usury statutes are inapplicable; (2) usury may not be "charged" against, or be a defense to, a holder in due course; and (3) since the plaintiffs had made payments for a long period of time and did not bring

suit until they had been paying on the note for more than two years, they are estopped from raising the issue of usury.

On the other hand the respondents contend that the transaction was not a "purchase money contract" or a time differential sale but was an original loan by Delta from the inception of the transaction, and the add-on interest charge made by Delta was in itself a violation of the usury laws.

Therefore, the question to be resolved is whether there was a loan of money made by Delta, and if so whether the loan was usurious.

■ Our duty on this appeal is to review this court-tried case upon the law and evidence and to reach our own findings of fact from a consideration of all the evidence in the case, giving due regard to the opportunity of the trial court to judge the credibility of the witnesses. We are not to set the judgment aside unless "clearly erroneous." Rule 73.01(d).[5] Personal Finance Co. of St. Louis v. Endicott, Mo.App., 238 S.W.2d 51.

Sec. 408.020 provides:[6]

"Creditors shall be allowed to receive interest at the rate of six percent per annum, when no other rate is agreed upon, for all moneys after they become due and payable, on written contracts, and on accounts after they become due and demand of payment is made; for money recovered for the use of another, and retained without the owner's knowledge of the receipt, and for all other money due or to become due for the forbearance of payment whereof an express promise to pay interest has been made."

4. Julius Watkins did file an affidavit on December 10, 1971, showing that since May 11, 1971, payments were made in the amount of $322.10.

5. All references are to V.A.M.R. or RSMo 1969, V.A.M.S., unless otherwise indicated.

6. The parties did not refer to or rely on Sec. 408.030 which authorizes them to agree, in writing, that the payment of interest will not exceed eight per cent per annum.

Sec. 408.050 provides:

". . . Any person who shall violate the foregoing prohibition of this section shall be subject to be sued, for any and all sums of money paid in excess of the principal and legal rate of interest of any loan, by the borrower, . . . and shall be adjudged to pay the costs of suit, including a reasonable attorney's fee to be determined by the court."

Usury has often been defined. "Usury is the exacting, taking or receiving of a greater rate than is allowed by law for the use or loan of money. In order for a transaction to be usurious there must be in it a loan at more than the legal rate of interest, or the exaction of a greater than the legal rate for the forbearance of a debt or sum of money due." General Motors Acceptance Corporation v. Weinrich, 218 Mo.App. 68, 262 S.W. 425, 428. In Allen v. Newton, 219 Mo.App. 74, 266 S.W. 327, usury is defined as " '. . . the excess over the legal rate charged to a borrower for the use of money. Taking illegal profit for the use of money.' " *Allen,* supra, 266 S.W. at 329. The requisite elements of usury have been stated to be: (1) an unlawful intent; (2) the subject matter must be money or money's equivalent; (3) a loan or forbearance; (4) the sum loaned must be absolutely, not contingently, payable; and (5) there must be an exaction for the use of the loan of something in excess of what is allowed by law. *Allen,* supra, 266 S.W. at 329. See also Bahl v. Miles, 222 Mo.App. 984, 6 S.W.2d 661 and Wyatt v. Commercial Credit Corp., Mo. App., 341 S.W.2d 348.

■ Usury is not to be presumed. It must be proved and the burden is on the person asserting it. *Wyatt,* supra.

■ In determining whether a transaction is usurious "The law will not tolerate any camouflage disguising a usurious transaction to make it seem innocent. 'The law looks at the nature and substance of the transaction, and not to the color or

form which the parties in their ingenuity have given it . . . . The courts will follow them through . . . and ascertain the true character and design of the transaction . . .' " Webster v. Sterling Finance Co., 355 Mo. 193, 195 S.W.2d 509, 514–515.

■ A distinction has been made in Missouri between a loan of money and a time price differential sale. The Missouri decisions to date have held that a time price differential sale does not violate the Missouri usury statutes. The real inquiry is whether there has been a borrowing and lending and if so, whether it was at a greater rate of interest than allowed by law, or whether there was a real and bona fide purchase of goods, services or even credit. The courts have carefully scrutinized the transaction and have stated that the " . . . law intends that the search [to see whether usury has been exacted] shall penetrate, through form, device or makeshift, to the very substance", and if a loan " . . . be cloaked in the outward form and appearance of a purchase, . . . [it] will not change the substance of the transaction nor hide the usury." *Weinrich,* supra, 262 S.W. at 428.

One of the latest decisions making the distinction between a time differential sale and usury is *Wyatt,* supra. There the Kansas City District held that where the buyers of refrigeration equipment bought at a time price, the transaction was not governed by the usury laws. There was found to be a bona fide sale and the time price was clearly stated. The court relied on and quoted from *Weinrich,* supra.

" 'It is true, a loan may be cloaked in the outward form and appearance of a purchase, in which case that will not change the substance of the transaction nor hide the usury. But if there is a real and bona fide purchase, not made as the occasion or pretext for a loan, the transaction will not be usurious even though the sale be for an exorbitant price, and a note is taken, at legal rates,

for the unpaid purchase money. The reason is that the statute against usury is striking at and forbidding the exaction or receipt of more than a specified legal rate for the hire of money and not of anything else; and a purchaser is not like the needy borrower, a victim of a rapacious lender, since he can refrain from the purchase if he does not choose to pay the price asked by the seller. So that a sale in good faith of property, merchandise, or of an indorsement, or guaranty, or even of credit, if the seller has no other interest in the transaction, is valid and not open to the objection of usury whatever the price . . .'" *Wyatt,* supra, 341 S.W.2d at 352.

To the same effect, see *Endicott,* supra; General Contract Purchase Corp. v. Propst, Mo.App., 239 S.W.2d 563; Holland-O'Neal Milling Co. v. Rawlings, 217 Mo. App. 466, 268 S.W. 683;[7] Hogg v. Ruffner, 66 U.S. (1 Black) 115, 17 L.Ed. 38 (1861); Discussion in Comment, Finance Charges or Time Price Differential In Installment Sales—Usury?, 24 Mo.L.Rev. 225; Comment, Usury—Effectiveness of the General Usury Statutes of Missouri—Sections 408.050 and 408.070, 26 Mo.L.Rev. 217; cases collected in Annot., Advance In Price For Credit Sale As Compared With Cash Sale As Usury, 14 A.L.R.3d 1065.[8] The Missouri decisions in this area have all been by the Courts of Appeals, and strangely enough our Supreme Court has never definitively passed on the issue.

Appellant relies on these decisions to urge that the transaction here was a time price differential sale and not a loan, and hence the trial court erred in entering the judgment it did. But even if we accept the validity of the prior decisions relating to time price differential sales, we do not believe these decisions are applicable to the transaction here because this transaction was not such a sale. In its findings of fact and conclusions of law the trial court held that "Contrary to the contention of Delta Loan & Finance Company the sale of the building to Lucas was not at a 'time differential price.'" We agree. This transaction had none of the elements of a time price differential sale. In the decisions cited supra there were certain common threads throughout. The cash price and the time price were shown and made known to the buyer, a chattel mortgage was taken on the item purchased, there was a bargain reached as to the cash price and the time price and the seller of the goods had no other interest in the transaction. *Weinrich, Wyatt, Endicott,* supra. The transaction here did not conform to these requirements. The whole interlocking relationship between Delta and Beco, the fact that the loan, for all practical purposes, did not go through until April of 1966, that Delta received add-on interest at the rate of 5% or $1,251.44 on the loan, that Beco would receive $901.07 set aside as a dealer reserve,[9] that the security was on property other than that sold, all show that in reality, and for all practical purposes, it was a loan for money

---

7. "The owner of property, whether real or personal, has a right to name the price at which he is willing to sell. He may offer to sell at a designated price for cash, or at a much higher price on a credit, and a credit sale will not constitute usury, however great the difference between the cash price and the credit price, unless the whole transaction was in fact a mere pretense and a sham in order to camouflage the real facts." *Holland-O'Neal,* supra, 268 S.W. at 686.

8. Recent decisions in other jurisdictions have held that such time price differential

sales do constitute a usurious transaction. Hare v. General Contract Purchase Corp., 220 Ark. 601, 249 S.W.2d 973; Sloan v. Sears, Roebuck & Co., Ark., 228 Ark. 464, 308 S.W.2d 802; Lloyd v. Gutgsell, 175 Neb. 775, 124 N.W.2d 198, reh. den. 176 Neb. 354, 126 N.W.2d 224.

9. The manager for Delta explained "dealer reserve;" "Well, it's money held back on the contract and at the end of the contract, when it's paid off, then the dealer gets the reserve. In other words, his profit."

and not a bona fide sale of goods. There was only one price for the home here ($2,214.80) and there was no time price differential. The fact is that the plaintiffs were loaned money in legal effect by Delta and were responsible to pay a $5,411.17 note. The trial court held that it is "clear" the note bore usurious interest. After disbursing $1,880.00 to Beco's credit, $378.77 for credit life insurance, and two checks in the amount of $500.00, each to Beco for the construction loan, the balance of the face amount of the note ($2,152.51) was shown on Delta's ledger sheet as "interest." And as found by the trial court, $901.07 was set up on the books as dealer reserve and $1,251.44 as Delta's discount on the purchase of the note. Delta set up their "loan" and "interest" charges separately on the account sheet.

The add-on interest charge by Delta could in itself be a violation of the usury statutes. See Annot., Taking or charging interest in advance as usury, 57 A.L.R.2d 630, 666; Hanson v. Acceptance Finance Co., Mo.App., 270 S.W.2d 143.

■ Appellant urges that usury cannot be a defense to a holder in due course. Sec. 400.3–302 defines a holder as one who takes the instrument for value, in good faith and without notice of any defense against or claim to it on the part of any person. Although the trial court held that Delta was a holder in due course, under the circumstances and facts as outlined here, and the intimate connection that Delta had in the transaction, it may well be that Delta was not a holder in due course. However, even if Delta is considered to be such a holder, the general rule is that usury is a defense against a holder in due course to the extent that a statute declares a transaction usurious as to the excess interest. See 11 Am.Jur.2d Bills and Notes, Sec. 679; Annot., Negotiable Instruments Law as affecting defense of Usury, 95 A.L.R. 735, 738; cf. Kelly v. Industrial Operating Co., 329 Mo. 629, 46 S.W.2d 181.

Appellant also contends that since the plaintiffs paid the installments for a period of more than two years, their conduct in making payments is inconsistent with their present position. Gershon v. Ashkanazie, 239 Mo.App. 1012, 199 S.W.2d 38; Propst, supra. The language in Propst that payments were made for seven months was not essential to the holding in the case that the transaction was a bona fide time price sale. In Gershon the fact of payments was a circumstance which had a "definite bearing upon the reasonableness and credibility of [the] testimony." Gershon, supra, 199 S.W.2d at 46. The issue of credibility is not a prime concern in the posture of this case.

■ If estoppel can be applied at all, the general view adopted is that the conduct or representations of the lender must be such that an innocent purchaser of the obligation has been induced to take the obligation because of his representations or conduct. In the circumstances here we hold that plaintiffs are not estopped from asserting usury. 45 Am.Jur.2d, Interest and Usury, Sec. 257. To constitute estoppel there must be an affirmative act by the borrower which injects usury into the transaction. See cases collected in Annot., 16 A.L.R.3d 510. Estoppel requires reliance and prejudice. It cannot be said that the appellant relied on the continued payments and that it is prejudiced by the judgment of the trial court since it received the amount of the loan plus the lawful rate of interest.

■ In summary, cutting to the heart of this whole transaction, it was more than a purchase of the paper by Delta. It was in reality a loan at usurious interest in legal effect by Delta. The 5% "add-on interest" of $1,251.44, the dealer reserve of $901.07, and the absence of a true time price differential sale made this transaction a loan in excess of the 6% rate and usurious under our law.

We have examined the transcript, depositions and exhibits filed in this cause. In view of the fact that we, as did the trial court, find this transaction to be a loan rather than a bona fide time price differential sale of goods, that the plaintiffs may assert usury against Delta, and that the plaintiffs are not estopped from asserting the usurious interest, the judgment of the trial court was not clearly erroneous.

Therefore, the judgment of the trial court is affirmed.

SMITH, P. J., and KELLY, J., concur.