William S. WOODS, Sr. and Shirley A. Woods, Plaintiffs-Appellants,

v.

EVANS PRODUCTS COMPANY, Plymouth Mortgage Service Co., and First National Bank of Minneapolis, Defendants-Respondents.

No. KCD29457.

Missouri Court of Appeals, Kansas City District.

Nov. 27, 1978.

M. Sperry Hickman, Independence, for plaintiffs-appellants.

Ross Eshelman, Clinton, for defendants-respondents.

Before SHANGLER, P. J., SWOFFORD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

Mr. and Mrs. Woods sue in this action to recover a portion of the money paid by them in connection with their purchase of a prefabricated home from Evans Products Company. Count I seeks recovery of an alleged unauthorized increase by Evans in the sale price which the Woods inadvertently paid. Count II seeks to recover the amount of what the Woods contend to be usurious interest. After hearing the Woods' evidence without a jury, the trial court dismissed Count II; and after hearing all the evidence, it gave judgment for the Woods on Count I. The Woods now appeal as to the dismissal of Count II.

On August 21, 1971, the Woods entered into negotiations with Evans for the purchase of a prefabricated home. Evans' agent Kiely at that time furnished them with a brochure showing various types of homes and the types of equipment available. Among other items of information set forth was a plan of financing. This information stated in part as follows:

> "For a small down payment you can get THE CAPP–HOME PURCHASE PLAN—arranged with a leading National Bank. Only Capp-Homes has a plan like this! This plan offers you *security* while making it easy for you to own your Capp-Home. Here's what you get:

> "1. Financing up to 12 years for your complete Capp-Home. (See specifications on pages 42 and 43) The plan requires only a small down payment. You pay the balance in minimum amounts each month, like rent. Special arrangements can be made for those who must pay quarterly, semi-annually or annually. (See Price List)

> "2. Simple interest rates, the same as at a National Bank. The interest applies on the monthly balance *only* during the actual use of borrowed funds. You can refinance at any time at your local bank, for instance, *without penalty charge. Caution*: Some companies charge interest in advance, costing you 3 times as much. *We don't.*" (Emphasis in the brochure)

During the conversation between the Woods and Kiely, the contents of the brochure were discussed, including the above quoted representations with respect to financing. The Woods picked out one of the homes described in the brochure, and a purchase order was signed by both parties. The pertinent parts of that document were as follows:

| | |
|---|---:|
| "Price of Home Described Above | $9130 |
| Wiring Package | 415 |
| Heating Package | 590 |
| Kitchen Cabinets | 690 |
| Plumbing Package | 795 |
| | |
| Total Sale Price | 11620 |
| Down Payment in Cash | 100 |
| Unpaid Balance of Price | 11520 |
| Sales Tax | 164 |
| Unpaid Principal Balance | 11684 |
| Time price differential | 7711 |
| Time Balance Owed | 19395 |
| Time Sale Price | 19495 |

Time Balance Owed Payable in 144 monthly installments of $135.00 each."

Following the original purchase order, some revisions and deviations from the original package were ordered by the Woods and agreed to by Evans. Evans then prepared a revised purchase order dated Sep-

tember 29, 1971, which, however, was never signed by the Woods and which plaintiff William Woods testified was never shown to them prior to the date of trial. The revision increased the basic price of the home from $9130, the amount shown in the August purchase order, to a higher figure of $9365. This difference of $235 was the subject matter of Count I in the Woods' petition. The trial court gave judgment to them for that item, and it no longer constitutes a matter in dispute.

Sometime in October, Evans mailed to the Woods a note in the sum of $20,199, payable in 144 monthly installments of $141, without interest. The note provided: "The makers shall have the right to prepay the balance due under this Note at any time prior to maturity or due date, without penalty." The note was accompanied by a mortgage, with Evans as mortgagee, covering the real estate upon which the prefabricated home was to be erected. The Woods also received a Disclosure Statement as required by 15 U.S.C.A. Secs. 1638 and 1605. See *Copley v. Rona Enterprises, Inc.*, 423 F.Supp. 979, 983 n. 5 (D.C.Ohio 1976). The Disclosure Statement sets forth the figures on the transaction as contained in the revised purchase order of September 29, 1971, and in addition, contains the required computation of "Annual Percentage Rate" at 9¼%. These documents were executed by the Woods and delivered to Evans at the time the merchandise making up the prefabricated home was delivered to the Woods. Thereafter, Evans assigned the note and mortgage to Plymouth Mortgage Service Company and First National Bank of Minneapolis.

In July, 1975, the Woods sold the home in question and wrote to obtain the figure required to pay off the note and deed of trust. The Woods up to that time had made 46 installment payments, and they paid in 1975 a final payment in the amount of $10,131, upon which the mortgage was finally released and the note paid in full.

The Woods make the following points on this appeal: (1) that the court erred in striking out certain evidence; and (1) that the court erred in sustaining the motion for judgment on Count II for the reason that the transaction was an usurious loan, not a purchase money contract "because there was security for the loan on other than the property sold and the bargain reached between the seller and buyer was for a cash price plus simple interest rates on the balance only."

I.

■ The evidence which the Woods contend was erroneously stricken came in as part of the cross-examination of plaintiff William Woods. He testified that during the course of his conversation with Kiely on August 21, 1971, and in connection with the discussion of financing, an interest figure of 7½% was discussed. Defendants requested that all testimony with respect to the 7½% figure be stricken on the ground that such evidence conflicted with the parole evidence rule. The trial court sustained that request. It is this ruling which the Woods challenge as their Point I.

It is unnecessary to rule whether the parole evidence rule bars the testimony in question. It can be assumed that the evidence is not barred by that rule. Even so, the evidence in question was immaterial and its striking was harmless.

It is to be noted that the Woods have at no time claimed that Evans breached any agreement to arrange financing at 7½% simple interest. The only claim of breach of contract is contained in Count I of the petition which related to an entirely different matter. The evidence with respect to the 7½% interest was offered only for the purpose of Count II, which was confined solely to the issue of usury.

On that issue of usury, the only question was whether the transaction between the Woods and Evans was a sale of property or a loan of money. As stated in the Woods' brief in this court, this testimony is claimed to be material as tending to establish "that the transaction was an usurious loan of money rather than a time-price differential as argued in Point II hereof."

That the Woods and Kiely did discuss financing and interest in connection therewith was given in evidence without objection and is not disputed. In Section II of this opinion, it will be shown that said discussion was without significance. However, even if the discussion were pertinent, the fact of the discussion was clearly established without the necessity of reference to any given interest percentage figure. What that exact figure may have been or whether any particular interest figure at all was discussed, is not in any way important. As already stated, the Woods did not seek to recover on any theory of breach of contract to obtain financing at any given figure. Rather their petition is confined to a claim that the amount actually paid by them exceeded the statutory rate of 8%, and the petition prays as damages only the difference of the statutory rate of 8% and the actual interest factor of 9¼%. The exact rate of interest discussed between the parties is therefore immaterial, and its exclusion cannot constitute prejudicial error.

## II.

■ With respect to its major contention that the transaction was usurious, the Woods concede the rule to be that a seller may set a time sale price higher than a cash price and that the difference between those two prices is not subject to the usury statute. The Woods nevertheless argue that this case falls within an exception to that rule. Their exclusive reliance for that contention is Lucas v. Beco Homes, Inc., 494 S.W.2d 417 (Mo.App.1973). An understanding of the ruling in Lucas requires a brief preliminary review of the earlier cases on this subject.

■ The well established traditional view has been that usury applies only to a loan of money and has no application to the sale of goods; that therefore a seller can establish a higher price for sale on time than for cash without raising any question of usury; and that such a sale stands separate and apart from any financing arrangement subsequently effected, such as the acquisition at a discount by a financial institution of the buyer's purchase note. Missouri has long followed this rule, the leading cases being the decisions by this court in *General Motors Acceptance Corporation v. Weinrich*, 218 Mo.App. 68, 262 S.W. 425 (1924) and *Wyatt v. Commercial Credit Corporation*, 341 S.W.2d 348 (Mo.App.1960).

*Weinrich* involved the sale of a new automobile by the dealer Reuter to Windsor. The cash price was $1,450 and a "time-selling price" was fixed at $1,501. Windsor bought at the time price and executed a note in payment. Reuter than sold Windsor's note to General Motors Acceptance Corp. at a "G.M.A.C. differential" of $51. G.M.A.C. was in the business of a banking institution specializing in automobile paper, and had furnished to automobile dealers generally blank forms of mortgages, notes and similar literature along with a uniform schedule of rates. Although G.M.A.C. did not instruct Reuter what interest to charge, it did furnish him with a rate card showing the amount of charges on terms, and the charges for various sums of money for various lengths of time. The amount computed according to the rate card for the amount of money and the length of time of the Windsor transaction came to $51.00. Windsor defaulted in payment on the note, and G.M.A.C. sued to replevin the automobile which had been given as security. Windsor defended on the ground that the note was usurious and the mortgage therefore void.

This court ruled that Windsor had failed to carry his burden of proving usury, holding that in order to constitute usury there must be a loan and further that "if there is a real and bona fide purchase, not made as the occasion or pretext for a loan, the transaction will not be usurious even though the sale be for an exorbitant price * * * And if the sale be a real and not a pretended transaction, it will not make any difference even though the seller have a cash price and a larger price where the sale is on time or credit." The court went on as follows (l.c. 262 S.W. 429):

"The mere fact that prior to the transaction plaintiff furnished Reuter with blank forms of chattel mortgages and

notes, together with the rates of discount it would pay, and also forms of statements relative to the sale and solvency of the purchaser and directions how to proceed, certainly does not conclusively show that the transaction was a scheme to enable plaintiff to effect an usurious loan to defendant by having the note and mortgage made to Reuter and then indorsed over to plaintiff by him. Plaintiff has no interest in the sale of automobiles. The furnishing of the above-mentioned blanks, rates, and information could very properly be done merely to facilitate the submission of notes to plaintiff, together with the required information relative to the desirability of the same, and thereby expedite the purchase by plaintiff of automobile paper taken by Reuter whenever he made a sale. The further fact that Reuter knew the discount he would have to allow in order to sell the paper to plaintiff, and his addition of only that much to his cash price of the automobile, would not necessarily make the transaction a loan from plaintiff to defendant. Desiring to make the sale and knowing that he could sell the note to plaintiff and the discount he would have to make, he could rightfully make the addition of that amount to the cash price of the automobile, the total being his time-selling price. This would not be usury on his part, since the transaction was a real sale."

In *Wyatt*, Wyatt purchased store fixtures from Reinhart-Welch. Wyatt originally signed a purchase order at a price of $24,-422.56, with the intention of paying the seller in cash with money which Wyatt intended to borrow from his bank. Running into difficulty getting a bank loan, Wyatt discussed financing with Reinhart-Welch and the possibility came up of using Commercial Credit Corporation. Reinhart-Welch had done business with Commercial Credit for years and had in its office a chart made up by all the financing companies, including Commercial Credit Corporation, showing the series of percentage rates and the amount to be added to the cash price to result in a certain percentage. Reinhart-Welch took a statement from Wyatt, showed this to Commercial Credit, and got a commitment from the latter to purchase the contemplated Wyatt note. Reinhart-Welch then prepared a chattel mortgage on a form furnished by Commercial Credit, showing a cash price of $24,422.56 and a time price of $27,754.82. After making a series of payments, Wyatt received advice that he was being overcharged, and the dispute began which led to litigation.

■ This court in *Wyatt* affirmed a judgment in favor of Commercial Credit upholding the note and chattel mortgage as executed. This court repeated what it had previously held in *Weinrich* to the effect that the usury laws do not apply to a bona fide sale of goods and that in order to be so subjected, the transaction must be found to have been in reality a loan. This court further held in *Wyatt* that the transaction there in suit was not "a ruse or device concocted to circumvent the usury statute by garbing a loan in the cloak of a sale." In reaching that result, this court held as follows:

"Commercial Credit Corporation was not in the business of selling fixtures. It was in the business of buying negotiable paper at discount rates. The fact that it furnished sellers of negotiable paper, including Reinhart-Welch, with blank forms of chattel mortgages or notes, together with the rates of discount it would pay in and of itself is not persuasive that the transaction was a mere scheme to enable defendants to effect a usurious loan to plaintiffs by having the paper made to Reinhart-Welch and then endorsed over to Commercial Credit Corporation. The furnishing by Commercial Credit Corporation of the mentioned forms, rates and information, and its request for data about plaintiffs' credit position could very properly be done to facilitate the submission of notes to it with data relative to the soundness of same, and thereby expedite proper consideration and purchase by Commercial Credit Corporation of negotiable paper taken by Reinhart-Welch whenever it made a sale. *Cf. General Motors Acceptance Corp. v. Weinrich, supra.*

"The fact that plaintiffs were offered goods at a cash price which they declined and at a higher time price which they accepted and that the difference between the two prices resulted in a percentage figure in excess of 6% is immaterial in view of the established law that there may be a cash price for property and a higher price for it where payments therefor are to be made in installments.

\* \* \* \* \* \*

"Plaintiffs would have us decide this case contrary to such decisions as *General Motors Acceptance Corp. v. Weinrich, supra; General Contracting Purchase Corp. v. Propst, supra,* [Mo.App., 239 S.W.2d 563]; *Personal Finance Co. v. Endicott, supra,* [Mo.App., 238 S.W.2d 51], and *Holland-O'Neal Milling Co. v. Rawlings, supra,* [217 Mo.App. 466, 268 S.W.2d 683], by adopting what they term to be the 'modern view' which would result in the facts before us being treated as within the usury statute. As examples of application of the 'modern view' they cite such cases as *Jackson v. Commercial Credit Corp.,* 90 Ga.App. 352, 83 S.E.2d 76; *Sloan v. Sears, Roebuck & Co.,* 228 Ark. 464, 308 S.W.2d 802, and *Seebold v. Eustermann,* 216 Minn. 566, 13 N.W.2d 739, 152 A.L.R. 585. An interesting statement of some of the various considerations involved in the so-called 'modern view' and 'traditional view' is contained in a comment in 24 Mo.L.Rev., pp. 225–40. Respondents assert our legislature recently in Senate Bills Nos. 97 and 98, 70th General Assembly, considered and failed to pass time sales regulatory legislation and that the courts should not disturb the existing law by a decision legislative in

nature. It is our view that we have correctly ruled the instant case under the existing statute; that in so doing we have followed all of the previous Missouri Appellate Court decisions on the subject; and that if a change such as appellants contend for is to be made it should properly come from the legislature."

See in general accord: *General Contract Purchase Corp. v. Propst,* 239 S.W.2d 563 (Mo.App.1951); *Holland-O'Neal Milling Co. v. Rawlings,* 217 Mo.App. 466, 268 S.W. 683 (1925); *Huber Mfg. Co. v. Ellis,* 199 Mo. App. 96, 201 S.W. 931 (1918); *Personal Finance Co. of St. Louis v. Endicott,* 238 S.W.2d 51 (Mo.App.1951). See also *Webster v. Sterling Finance Co.,* 355 Mo. 193, 195 S.W.2d 509, l.c. 514 (1946) citing and quoting *Weinrich* with approval. *Cf. White v. Anderson,* 164 Mo.App. 132, 147 S.W. 1122 (1912).[1]

*Lucas v. Beco Homes, Inc., supra,* the single authority upon which the Woods rely, does not purport to overrule any of the foregoing cases. Rather, that case emphasized the recognition in the previous cases that a transaction can be a usurious loan even though camouflaged and disguised in an effort to avoid the usury statutes. Applying that concept, *Lucas* held the transaction there involved to be an usurious loan. That result, however, was premised upon the peculiar facts in the *Lucas* case.

In that case, Mr. and Mrs. Lucas agreed to buy a surplus home being offered for sale by Beco Homes, Inc. A total purchase price was agreed upon of $3,214.80 which included $1,000 in the nature of a construction loan to help the Lucases in the assembly of the dismantled building when it was delivered. A cash payment was made of $14.80.

---

1. A number of more recent cases in other jurisdictions have followed the same thought as did *Wyatt* with respect to it being preferable for the legislature rather than the judiciary to make any fundamental change in the traditional view, especially in view of the massive impact which such a change would have on the huge volume of installment credit outstanding at any given time which had been extended in reliance on existing law, and also because of the fundamental changes which would be required in a major method of conducting business. *E. g., Howell v. Midstate Homes, Inc.,* 13 Ariz.App. 371, 476 P.2d 892 (1970); *Petersen v. Philco Finance Corporation,* 91 Idaho 644, 428 P.2d 961 (1967). Even if a change in favor of the minority "modern view" were to be contemplated by judicial rather than legislative action, that would be appropriate only for the Supreme Court, not an intermediate appellate court. *Breece v. Jett,* 556 S.W.2d 696, 708[5] (Mo.App.1977); *Warren v. Director, Missouri Division of Health,* 565 S.W.2d 740, 743 (Mo. App.1978).

Then Mr. and Mrs. Lucas, together with Mr. and Mrs. Watkins who owned the real estate upon which the home was to be erected, executed a note to Beco Homes of $5,411.17, and a quit claim deed to the Watkins' real estate was delivered as security for the note.

Beco Homes had an arrangement with Delta Loan & Finance Company "to do the financing on the sale of these homes" and it had been agreed that when the homes were sold, and if they were sold on credit, the paper would first be offered to Delta. The Lucas and Watkins note was so offered to Delta by Beco and was accepted by Delta. Delta made up a sheet of computations which showed a "time differential" of $1,251.44 and a "dealer reserve" of $901.07. The $1,251.44 figure represented advance computation of interest at 5% for seven years on the invoice price.[2] The dealer reserve was an amount to be held by Delta for Beco until the total indebtedness was satisfied. Delta made distribution to Beco of the $1,000 sum contemplated as a construction loan to Lucas, but Beco never gave plaintiffs the $1,000 and the building was never assembled.

The trial court held that the note signed by the Lucases was usurious and gave them judgment accordingly for the amount paid by them in excess of the statutory maximum interest. On appeal, the judgment was affirmed. The court of appeals pointed out its limited role in reviewing a court tried case and found that the judgment of the trial court was not clearly erroneous. In reaching that conclusion, the court of appeals emphasized the finding of fact and conclusion of law by the trial court that "[c]ontrary to the contention of Delta Loan & Finance Company the sale of the building to Lucas was not a 'time differential price.' "

That ultimate determination rested upon the following principal factors: (1) a whole interlocking relationship existed between Delta and Beco; (2) the different cash price and time price were not shown and made known to the buyer; and (3) Beco and Delta took security on property other than that sold by Beco.

The situation in *Lucas* is so factually different as to make that case inapplicable here. First and foremost, *Lucas* had a situation where an on-going interlocking relationship existed between Delta and Beco, thereby tying Delta to the original "purchase" transaction.[3] Here, by way of contrast, there is no showing of any continuing relationship between Evans Products Co. on the one hand and Plymouth Mortgage Service Co. and First National Bank of Minneapolis on the other hand. The only meager evidence in this respect is the statement in the Evans' brochure to the effect that it had a purchase plan "arranged with a leading National Bank." That brochure did not name defendant First National Bank of Minneapolis as being the bank referred to, and there is no mention at all of any mortgage service company. The record in this case is void of any detail as to just what Evans had arranged with any national bank, and certainly there is nothing with respect to any arrangement which it had with First National Bank of Minneapolis. More particularly, there is no showing here that the financing institutions had any dealer reserve hold back from Evans, such as was present and emphasized in the *Lucas* case. Nor was there in this case any showing as to the manner of computation of the 9¼% interest factor shown in the disclosure statement furnished to plaintiffs. If that 9¼% represented an add-on such as the court emphasized in *Lucas,* such fact was never shown by plaintiffs.[4] Furthermore,

---

2. Although the 5% interest rate might appear superficially to be within the statutory maximum rate of interest, the add-on feature operated obliquely to bring the effective rate of interest over the statutory maximum, as was specifically pointed out by the *Lucas* opinion.

3. See Case Note on the *Lucas* case, 39 Mo.L. Rev. 111 (1974) which states that the court in

*Lucas* "based its decision on the 'whole interlocking relationship' between Delta and Beco."

4. Simple arithmetic demonstrates that the time price differential here did not represent an add-on of a 7½% charge, the rate of interest Woods claimed he discussed with Kiely. 7.5 × 12

the 9¼% annual financing cost was fully disclosed here by means of the disclosure statement, which stands in contrast to the camouflaged way in which statutory interest was exceeded in *Lucas.*

Next, in contrast to the failure in *Lucas* to expressly make known a cash price and a different time price, those two options were plainly made known to and understood by the Woods. That fact is demonstrated by the following testimony on cross-examination of Mr. Woods: "Q. (By Mr. Eshelman) Mr. Woods, when you purchased this home or signed the purchase order with Mr. Kiely, you understood you could pay cash for the home if you wanted to? A. Absolutely." This fact is further demonstrated by the purchase order signed by plaintiffs which did give a cash price and a separate higher time sale price.

Finally, with respect to the matter of security, it is to be noted that the real estate security demanded and received in *Lucas* was upon real estate owned by a party (Watkins) other than the purchasers. Furthermore, the seller in *Lucas* engaged in the very shady practice, to say the least, of charging for a construction loan which it never made and thereby made it difficult if not impossible for the purchasers to ever erect the dismantled home. By way of contrast in the present case, the real estate on which a mortgage was given was owned by the purchasers (the Woods) and it was upon that land that the home purchased from Evans was in fact erected without incident. Surely Evans' taking of a mortgage on this real estate on which the prefabricated home almost immediately became a part, should not and cannot be considered a badge of fraud so as to convert a perfectly legitimate sale with legitimate security into something else.

In an effort to transform the transaction here from a sale to one for a loan of money, the Woods' brief speaks repeatedly of and makes heavy reliance upon the Evans' brochure in which reference is made to a purchase plan upon "simple interest rates" which would apply "on the monthly balance *only* during the actual use of the borrowed funds." They seem to believe that if a deferred time purchase price has been calculated in accordance with a rate of interest, then that converts the entire transaction into one for a loan of money which therefore comes within the scope of the usury laws.[5] There are many cases holding exactly to the contrary. 45 Am.Jur.2d Interest and Usury Sec. 123, p. 107; *Howell v. Midstate Homes Inc.,* 13 Ariz.App. 371, 476 P.2d 892 (1970); *Petersen v. Philco Finance Corporation,* 91 Idaho 641, 428 P.2d 961 (1967); *Steffenauer v. Mytelka & Rose, Inc.,* 87 N.J.Super. 506, 210 A.2d 88 (1965); *Davidson v. Davis,* 59 Fla. 476, 52 So. 139 (1910); *Irvin v. Mathews,* 75 Ga. 739 (1885); *Melnicoff v. Huber Investment Co.,* 12 Pa. D&C 405 (1929); *First Nat. Bank v. Mann,* 94 Tenn. 17, 27 S.W. 1015 (1894). The rationale of these cases is well stated in the Tennessee decision last cited:

> "The argument is that the 8 per cent agreed to be given is a part of the consideration to be given, and is but a mode of expressing the difference between the cash and credit price of the goods sold, and that it is not usurious to charge more than legal interest when credit is given, and this difference in credit and cash price may as well be put in the shape of a per cent for the time credit is extended as in the shape of a round sum for such time or credit. In other words, a party may be willing to take for a horse $100 in cash, but would not be willing to sell the same horse on 12 months' credit for less than $120, and such sale at $120 would be legal, and not in any respect usurious; and it is now insisted it cannot matter whether the additional amount of $20 charged for this credit is stated as a round sum or as a per cent upon the $100

(years of credit) × $12,168 (the "amount financed" shown in the Disclosure Statement) + $12,168 = $23,119. The face amount of the purchase note was in fact only $20,199.

5. This belief accounts for the insistence by the Woods under their Point I, that they should have been allowed to show their discussion with Kiely of a 7½% interest rate.

for the 12 months' credit granted. This contention is well supported by authorities in our own state and elsewhere [citing cases]."

This court adopted the same reasoning in the *Weinrich* case, *supra,* when it held: "The further fact that Reuter knew the discount he would have to allow in order to sell the paper to plaintiff, and his addition of only that much to his cash price of the automobile, would not necessarily make the transaction a loan from plaintiff to defendant. Desiring to make the sale and knowing that he could sell the note to plaintiff and the discount he would have to make, he could rightfully make the addition of that amount to the cash price of the automobile, the total being his time-selling price. This would not be usury on his part, since the transaction was a real sale."

Nor does it make any difference that Evans agreed in advance to permit Woods to make prepayment of the purchase money note at any time without penalty.[6] This agreement was obviously to the benefit of the buyer and cannot be said to be inconsistent with the concept of a sale transaction between Evans and Woods. It should not and will not be viewed as evidence of a fraudulent design to evade the usury laws.

All the Missouri decisions unite in declaring that the ultimate question in a case of this sort, on which the one asserting usury has the burden of proof, is whether the transaction was a bona fide sale of merchandise rather than a loan of money. The trial court here on a bench trial held the transaction to be a bona fide sale. In so finding and concluding, the trial court did not state or apply incorrect legal principles, the decision was supported by substantial evidence and was not against the weight of the evidence. Accordingly, under the standard of review declared in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), the judgment must be affirmed.

All concur.

6. Defendants did in fact honor this commitment. When the Woods paid off the note in 1975, they paid a lump sum of $10,131 in addition to the $6,486 previously paid by them in installments, making a total payment by them on the note of $16,617. This compares with the full face amount of the note of $20,199.